UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 08-60056-CIV-ZLOCH/Snow

CARALYN SUZANNE SCONZO,

             Plaintiff,

        vs.

MICHAEL J. ASTRUE, Commissioner
of Social Security,

             Defendant.
_____/

## REPORT AND RECOMMENDATION

This cause is before the Court on the plaintiff's complaint seeking judicial review of a final decision of the Social Security Administration denying the plaintiff's application for disability benefits. The complaint was filed pursuant to the Social Security Act, 42 U.S.C. § 401, et. seq., and was referred to United States Magistrate Judge Lurana S. Snow for report and recommendation.

## I. PROCEDURAL HISTORY

The plaintiff filed an application for disability benefits on May 27, 2005, alleging disability since February 9, 2004, as a result of knee, back and hand pain and depression. The application was denied initially and upon reconsideration. The plaintiff then requested a hearing which was held before Administrative Law Judge (ALJ) Robert Spurlin on August 8, 2006.

The ALJ found that the plaintiff was not disabled within the meaning of the Social Security Act.  The Appeals Council denied the plaintiff's request for review on November 14, 2007.  The plaintiff then filed this action seeking judicial review of the decision of the Commissioner.

## II. FACTS

The plaintiff was born in June 1963 and was 43 years old at the time of the hearing.  She has a high school education and her past relevant work was as an assistant bank teller, assistant manager of a drug store, department store cashier and bank teller supervisor.  The plaintiff was involved in an automobile accident in August 2003, during which she suffered knee injuries, a pinched nerve in her back and a chipped bone in her left hand.  The plaintiff also suffers from depression and has not worked since February 9, 2004. (R: 62-64, 533)

A. Physical Impairments

The medical record reflects that the plaintiff was diagnosed with carpal tunnel syndrome in 2003, prior to her automobile accident.  Also, as of March 5, 2003, the plaintiff was taking Wellbutrin and Paxil, and was borderline morbidly obese. (R: 152-53, 157)

Immediately following the accident on August 14, 2003, the plaintiff was transported by ambulance to University Hospital,

Tamarac, Florida.  Treatment notes reflect that the plaintiff had been ambulatory at the scene of the accident, but complained of pain in both knees.  She was instructed to rest and apply ice to her knees for 48 hours, and to return to the hospital if her symptoms worsened.  (R:116-18)

An MRI of the plaintiff's right knee was performed on November 6, 2003.  It revealed probable tears, anterior and posterior horns, medial and lateral menisci. (R:124)

On December 15, 2003, the plaintiff began treatment for left hand and bilateral knee pain with Mitchell Pollack, M.D., an orthopedist.  Physical examination of the plaintiff revealed a positive Tinel's and Palen's exam in the left wrist.  Also, there was tenderness to palpation of the trapezial-metacarpal joint of the left thumb.  (R:472)

Examination of the plaintiff's knees indicated tenderness to palpation about the medial joint line.  There was a mildly positive Steinman's exam as well as tenderness along the lateral joint line.  The plaintiff experienced pain associated with patella-femoral compression.  Symptoms were worse in the right knee.  Id.

There were no visible fractures in X-rays of the plaintiff's left hand and both knees. Dr. Pollack's diagnostic impression was: left carpal tunnel syndrome; contusion with concern

3

for occult fracture of the 5th metacarpal; injury to the trapezial-metacarpal joint of the left thumb; internal derangement of the right knee with cartilage tears, and internal derangement of the left knee with suspected cartilage tears. The doctor gave the plaintiff an injection of Depo-Medrol with a mixture of Lidocaine and Marcaine, which the plaintiff tolerated well with improvement. (R:473)

The plaintiff was given a hinged knee brace and a thumb spica forearm brace. Dr. Pollack prescribed physical therapy and told the plaintiff that if her symptoms did not improve, they would discuss arthroscopic surgery on the right knee. (R:474)

The plaintiff returned to Dr. Pollack on January 12, 2004. Although she showed some improvement, she continued to experience pain, particularly in the right knee. Dr. Pollack diagnosed tears in the medial and lateral menisci, hypertrophic synovitis and chodromalacia. He recommended surgery, and on February 9, 2004, the plaintiff underwent a partial medial meniscectomy, partial lateral meniscectomy, synovectomy and chondroplasty. (R:465-67, 469-70)

In February and March 2003, Dr. Pollack noted that the plaintiff's right knee was healing well, but she was experiencing some pain in her left knee and left wrist. On April 13, 2004, the plaintiff reported that her left knee had given out, causing her to

4

fall.  Dr. Pollack ordered an MRI of the plaintiff's left knee, which was performed on April 16, 2004.  The test revealed small to moderate knee join effusion and mild meniscal degeneration, with no evidence of meniscal tears.  (R:457-63)

During an office visit on April 22, 2004, Dr. Pollack noted that the plaintiff now was experiencing more pain in left knee than her right.  He gave her an injection of Depo-Medrol with Lidocaine and Marcaine.  On May 13, 2004, the plaintiff exhibited the same symptoms, and another injection was given. (R:449, 455)

On May 17, 2004, Dr. Pollack completed a U.S. Department of Labor Form stating that the plaintiff was unable to lift, bend, drive or sit for long periods of time, and was precluded from excessive walking.  He noted left knee pain, positive grind and mildly positive Steinman's exam; right knee was status post-arthroscopic surgery with signs of improvement.  The plaintiff was restricted to light duty work. (R:451-53)

The plaintiff had regular follow-up visits with Dr. Pollack in June, July, August and September 2004.  She continued to complain of pain in both knees, although she showed overall improvement.  Dr. Pollack prescribed occupational therapy and gentle motion exercises, and administered injections. (R:438-48)

On October 28, 2004, the plaintiff also complained of back pain.  Examination of the lumbar spine revealed spasm and

tenderness throughout the back area, most prominent in the sacroiliac joint on the right and in the sciatic notch on the right. There was tenderness and pain in both knees, with mild restriction in range of motion and mild joint swelling. Dr. Pollack concluded that the plaintiff had achieved Maximum Medical Improvement in her course of orthopedic care. He instructed her to continue with gentle motion exercises and to avoid activities which tended to exacerbate her condition. (R:436-37)

In a letter to the plaintiff's attorney dated November 8, 2004, Dr. Pollack summarized the plaintiff's course of treatment. He stated that the plaintiff may require therapy, injections, bracing and intermittent use of medications in the future, as well as arthroscopic debridement and repeat MRI scans. He concluded that the plaintiff, as the result of her accident, had a permanent injury to both knees, consisting of bilateral cartilage damage with tears of the medial and lateral meniscus, hypertropic synovitis and chondromalacia with persistent loss of function. He opined that the plaintiff had sustained a 13% permanent partial disability of the body as whole. (R:432-35)

On February 28, 2005, the plaintiff returned to Dr. Pollack with continued complaints of low back and knee pain. Dr. Pollack ordered an MRI of each knee. The MRI of the right knee showed small knee joint effusion with no evidence of internal

derangement.  Degeneration was noted without evidence of meniscal tears.  The MRI of the left knee revealed mild to moderate knee joint effusion with no other significant abnormalities.  There was mild meniscal degeneration with no evidence of internal derangement.  In a follow-up visit to Dr. Pollack on March 21, 2005, Dr. Pollack prescribed aquatherapy exercises, intermittent brace wear, an exercise program and avoidance of activities that tend to exacerbate her condition. (R:424-29)

On June 15, 2005, the plaintiff began treatment with another orthopedist, Barney Horvath, M.D.  Dr. Horvath's examination revealed bilateral knee swelling with pain, portals well healed on the right knee.  The plaintiff's lower back was stiff, with limitation of range of motion but no neurological deficits distally.  Both hands showed numbness and tingling at the level of the first 3½ digits.  Dr. Horvath's diagnostic impression was lumbosacral derangement, secondary to discogenic disease; rule out carpal tunnel, both wrists.  He ordered a nerve conduction study and an MRI of the lumbosacral spine.  Dr. Horvath also stated that the plaintiff should not be working and there is great doubt that her abilities to work would ever return. (R:167)

On June 21, 2003, the plaintiff was evaluated for carpal tunnel syndrome by Allen J. Teman, M.D., a neurologist.  Dr. Teman found a very minuscule touch of left hand carpal tunnel syndrome,

which he believed would do well with nocturnal wrist splinting alone. (R:164-65)

An MRI of the plaintiff's lumbar spine performed on June 20, 2005, revealed the following: (1) mild degenerative spondylitis changes in the lower thoracic spine at the T9-T10 and T10-T11 levels; (2) abnormal lumbar disk intervals; (3) disk degeneration at L3-L4 with mild end-plate spondylosis and broad-based right paracentral disk protrusion with thecal sac impingement, and (4) early disk dessication at L5-S1, with slight end-plate spondylitis change and mild bulging annulus. (R:163)

On June 22, 2005, Dr. Horvath reviewed the neurological and MRI results and diagnosed bulging discs, secondary sciatica. He administered a paravertebral injection of Cortisone and instructed the plaintiff to return in six weeks for follow-up. On August 8, 2005, Dr. Horvath noted that the plaintiff was having difficulties with her right knee and lower back, and that the shot had helped minimally. His diagnostic impression was discogenic disease, lumbosacral spine and arthritis, right knee, post-arthroscopy. The plaintiff was given a Cortisone injection in her back. (R:161)

On October 12, 2005, an independent medical examination of the plaintiff was done by Audie M. Rolnick, M.D., an orthopedic surgeon. Dr. Rolnick noted that the plaintiff was obese and

8

ambulated with the use of a cane in her wright hand.  She was using a knee wrap on her right knee as well as an Ace bandage.  (R:193)

Examination of the plaintiff's right hand showed a healed carpal tunnel incision with no atrophy and negative Tinel's sign. As to her left hand, there was no tenderness at the fifth metacarpal with full range of motion.  Grip strength was good, there was no atrophy and negative Tinel's sign. Id.

Examination of the lumbar spine revealed that the plaintiff was tender to palpation within the thoracic and lumbar areas.  Her flexion was 45 degrees. The plaintiff had some difficulty with toe and heel walking.  In the sitting position, straight leg raise was positive for lower back pain.  In the supine position, straight leg raises caused back pain beyond 35 degrees bilaterally.  Sensory and motor were within normal limits.  Id.

The Q angles of both knees were normal.  The plaintiff had mild patellofemoral tenderness bilaterally, with no effusions bilaterally.  She had range of motion from zero to 100 degrees before complaining of pain.  She had mild medial and lateral joint line tenderness bilaterally and no instability to stress testing. (R:194)

Dr. Rolnick's diagnostic impressions were: (1) persistent back pain in an obese female which had not improved significantly with injections; (2) evidence of giving way of her right knee as

9

well as pain in both knees, most likely related to synovitis, but chondromalacia could not be ruled out, and (3) evidence of intermittent carpal tunnel syndrome in the left upper extremity, with no neurologic changes in the right upper extremity. He recommended an aggressive weight loss program and an aggressive physical therapy stretching and strengthening program. Id.

Dr. Rolnick agreed with Dr. Pollack that the plaintiff had permanent limitations which include limited ability to stand and walk on a regular basis, limited ability to kneel, lift and bend. Therefore, he did not believe that the plaintiff could return to the job description that she had as an assistant manager at an Eckerd store. (R:194-95)

On December 28, 2005, a consultative physical examination of the plaintiff was performed by John J. Catano, M.D. Dr. Catano noted that the plaintiff was 5'2" tall and weighed 218 pounds. Examination of her hands revealed that her gross and fine manipulation was intact. The plaintiff was able to button and unbutton her clothing and pick up coins. Grip strength was 5/5 on both hands, and there was no atrophy. Tinel's sign was negative. (R:200-201)

Dr. Catano's examination of the plaintiff's knees showed two puncture scars on the right knee from her previous Arthroscopic Debridement. There was no swelling, deformity or effusion. There

10

was some pain with varus and vagus tests, but no instability.  The plaintiff wore a brace for support.  Left knee examination revealed no deformity or effusion, but there was mild pain with minimal decrease in range of motion.  In the plaintiff's lower back, there was some tenderness and spasm on parapinalis muscle.  Straight leg raising in the supine and seated position was negative. (R:201)

Dr. Catano observed that the plaintiff's ambulation was antalgic secondary mostly to right knee pain.  The use of a cane might be necessary outdoors.  The plaintiff got in and out of a chair and on and off the examining table by herself with some difficulty.  Range of motion of the low back was to 60 degrees of anterior flexion.  The plaintiff could tandem walk and walked on her heels and toes with difficulty.  Neurological examination was normal with no sensory or motor deficit.  Id.

Dr. Catano's diagnostic impression was: (1) right knee post-traumatic arthritis, status post arthroscopic surgery; (2) chronic lower back pain syndrome, and (3) status post carpal tunnel release of the right hand.  Id.

On July 6, 2006, the plaintiff returned to Dr. Pollack, complaining of pain in her back, knees and left hand.  Dr. Pollack's examination of the plaintiff's left arm revealed a positive Tinel's in the cubital tunnel with the reproduction of paresthesias in the ulnar nerve distribution.  There was a mildly

positive Palen's examination in the wrist with an equivocal Tinel's exam, again with the reproduction of paresthesias in the ulnar nerve distribution.  (R:517)

Dr. Pollack's examination of the plaintiff's lumbar spine showed spasm and tenderness throughout the back.  There was tenderness in the peri-spinous musculature throughout the lumbar region.  There also was tenderness in the sciatic notch area, sacroiliac joints and piriform fossa.  Dr. Pollack observed restriction in flexion, extension, bend and rotation with increased pain on exam.  Id.

Examination of the plaintiff's knees revealed tenderness to palpation about the knee joint areas, both medially and laterally.  There was pain with patellofemoral compression and positive grind.  The ligaments were stable to anterior and posterior drawer, varus and valgus stress.  The popliteal fossa was non-tender without masses.  There was mild positive Steinman's exam.  Dr. Pollack noted that the symptoms were more severe in the right knee.  Id.

Dr. Pollack recommended evaluation by a hand surgeon for further treatment of the plaintiff's cubital tunnel syndrome and Runyon's canal syndrome; use of an elbow pad, intermittent therapy and use of medications; consideration for pain center evaluation, and a controlled weight loss reduction program. (R:518)

On August 2, 2006, Dr. Pollack completed an assessment of the plaintiff for her attorney.  His diagnosis was low back pain, internal derangement in the right knee; carpal tunnel syndrome in the left hand and osteo-arthritis of the knee.  He stated that the plaintiff's impairments could be expected to last more than twelve months.  Dr. Pollack opined that the plaintiff could continuously sit for one hour and stand for 30 minutes.  She would need to include periods of walking during the day and would need to shift positions from sitting, standing or walking at will.  She could not get through an eight-hour work day without lying down. (R: 415-16)

Dr. Pollack further opined that the plaintiff could lift up to ten pounds occasionally, but could never lift twenty pounds. The plaintiff had significant limitations in the ability to grasp, turn and twist objects with her left hand, as well as problems with fine manipulation and reaching with that hand.  She had no similar limitations with her right hand.  The plaintiff could bend and twist at the waist occasionally.  Dr. Pollack believed that the plaintiff's impairments would cause her to be absent from work more than three times per month.  (R:417)

On July 5, 2006, an assessment of the plaintiff's employability was performed at Options Plus in Hollywood, Florida. The plaintiff stated that she enjoyed crafts and was pursuing an interest in flower arranging.  She had sold flower arrangements at

13

a local flea market and had attended a flower show in Tampa.  The plaintiff also had taken courses in creative writing and writing children's books.  On the advice of her doctors, she used the local swimming pool on a daily basis for exercise.  The plaintiff noted that her problems with depression had never caused her to lose a job. (R:502, 506)

After an analysis of the plaintiff's medical records and employment history, the Options Plus report concluded that the plaintiff was unable to perform the duties of any gainful occupation for which she was reasonably fitted by education, training and/or experience. (R:503-510)  In an Addendum dated August 21, 2006, after additional medical information was considered, Options Plus found that the plaintiff's work capacity was limited to a sedentary physical demand category. (R:514)

At the hearing, the plaintiff testified her last job had been as an assistant manager on Eckerd's project team, and was involved in the remodeling of stores and building of new stores. During the course of an eight-hour day, she was engaged in walking for six or seven hours.  She had planned to return to her job at Eckerd's after her surgery in February 2004.  Prior to working at Eckerd's, the plaintiff was employed as a bank teller, a job which mostly involved standing.  (R:533-34)

The plaintiff stated that she is limited in her abilities to walk, bend, reach, kneel and stretch.  Her knee hurts and gives out at times.  She also experiences pain in her left hand, which Dr. Pollack told her was the result of cubical tunnel syndrome.  As a result, it is difficult for the plaintiff to lift things.  She estimated that she could lift ten pounds with her right hand, but only seven pounds with her left.  She can only hold an object, such as a book or a telephone, for fifteen or twenty minutes.  (R: 535, 537-38)

The plaintiff testified that her back pain results in an inability to sit for more than half an hour before she must change positions.  She added that sometimes the pain goes from her lower back to her upper back to her neck.  The plaintiff estimated that she can walk no more than twenty to thirty minutes on a good day, and no more than ten or fifteen minutes when she was in pain.  She was able to stand for no more than fifteen or twenty minutes. (R:539-40)

The plaintiff is still able to drive, but not for long distances.  She sometimes uses a cane.  The plaintiff stated that she has been depressed since her accident because she cannot physically do the things she used to do.  She does not believe she could do any type of job, even a sedentary one, because it was hard for her to sit for a long period of time.  Id.

15

B. <u>Mental Impairments</u>

The record indicates that the plaintiff began therapy for anxiety and depression with Judith Seigel, LCSW, on February 19, 2002, and continued to see Ms. Seigel on a weekly basis through the date of the disability hearing.  (R:252-396)  Following the initial interview, Ms. Seigel noted that the plaintiff was taking Wellbutrin and Ambien.  The plaintiff told Ms. Seigel that she had been depressed since childhood, and had been hospitalized on two occasions, in 1989 and 1995.  (R:394-95)

On February 21, 2003, the plaintiff was evaluated by Ely D. Pelta, a psychiatrist, for prescription and monitoring of medication.  Dr. Pelta noted that the plaintiff had a long history of depression.  The plaintiff told Dr. Pelta that she had been sexually abused by a brother and a cousin.  Dr. Pelta diagnosed Major Depression, recurrent, rule out Bipolar Disorder II, and assigned a Global Assessment of Functioning (GAF) score of 75.  Dr. Pelta determined to continue the plaintiff on Wellbutrin, and prescribed additional medications, including Paxil. (R:240-43)  The plaintiff had follow-up and medical management visits with Karen McNeely, a nurse practitioner.  (R:227-39)

On February 12, 2004, the plaintiff told Ms. Seigel that she had just had surgery performed on her knee, and did not want to give her energy to work anymore.  By April 1, 2004, the plaintiff

16

reported that her knee was improving and she was continuing to take online floral classes.  On May 19, 2004, the plaintiff was still doing floral course work.  On May 26, 2004, the plaintiff planned to attend a party for a store manager who was going to Iraq. (R:353-54, 359, 366)

On October 5, 2004, the plaintiff advised Ms. Seigel that she had started to get business on Ebay with flowers, about which she felt good.  On November 23, 2004, the plaintiff told the therapist that she had gone to Tampa for a show, where she had sold quite a bit.  The plaintiff related that she had stayed in Tampa for five days and had a good time. (R: 331, 337)

By February 8, 2005, the plaintiff reported to Ms. Seigel that she was feeling much better emotionally, but became overwhelmed when she had too much to do.  On February 15, 2005, the plaintiff stated that she was still doing her flowers and was working at a store a few hours a week.  However, on March 1, 2005, the plaintiff was upset because her lawyers told her that she could be being watched by the other side.  The lawyers had instructed her not to work at the store.  On March 15, 2005, the plaintiff spoke of her plans to go to New York with her mother to visit her brother.  (R:316-20)

On July 19, 2005, the plaintiff apprised Ms. Seigel that she had been going to the pool, which she enjoyed, and was

17

exercising her knees.  On November 9, 2005, the plaintiff reported that she had returned from a great trip to Tampa and was going to Disney World the next weekend.  On April 16, 2006, the plaintiff stated that she was keeping busy with her crafts and was going to church. (R:260, 283, 298)

On April 6, 2005, Ms. Seigel completed an Attending Physician Statement In Support of Disability.  Ms. Seigel described the plaintiff's symptoms as severe depression, anxiety, helplessness and hopelessness, in addition to constant physical pain.  Ms. Seigel's diagnosis was Major Depressive Disorder, Recurrent and Adjustment Disorder with depression and anxiety.  GAF was 55.  Ms. Seigel stated that she did not believe the plaintiff would ever be able to return to any type of work that she had been engaged in for the past twenty years. (R:312-13)

On October 6, 2005, Karen McNeely, ARNP, completed a psychological questionnaire sent by the plaintiff's attorney to Dr. Pelta.  Ms. McNeely stated that she had seen the plaintiff every one to three months since February 2003.  The plaintiff's diagnosis was Major Depression, Recurrent, with the following symptoms: poor memory, irritability, social withdrawal and isolation, emotional liability, recurrent panic attacks, feelings of guilt/worthlessness, anhedonia/pervasive loss of interests,

difficulty thinking or concentrating, generalized persistent anxiety, mood disturbance and decreased energy. (R:229-30)

Ms. McNeely opined that the plaintiff's condition had lasted or could be expected to last at least twelve months, and her prognosis was guarded. According to Ms. McNeely, the plaintiff had moderate restrictions in the activities of daily living, moderate difficulties in maintaining social functioning and moderate deficiencies of concentration, persistence or pace, resulting in failure to complete tasks in a timely manner (in work settings and elsewhere). The plaintiff experienced marked episodes of deterioration or decompensation in work or work-like settings which caused her to withdraw or experience exacerbation of symptoms. Ms. McNeely believed that the plaintiff's impairments or treatment would cause her to miss work more than twice per month. (R:231-32)

On December 27, 2005, a consultative evaluation of the plaintiff was performed by psychologist Luis R. Zaldivar, Ph.D. The plaintiff told Dr. Zaldivar that she had been sexually molested at age five and again at age nine, once by her brother and once by her cousin. The plaintiff stated that she could not work anymore because she had been in a car accident in August 2003, and her right knee was not getting better. (R:196)

The plaintiff reported that she was taking Cymbalta, Lexapro, Seroquel, Klonopin, Advil and Glucosamine. She related

that she cannot walk, sit or stand for too long, and wakes up frequently as the result of pain in her back and leg. If the plaintiff were to remove her brace, her knee might give out, causing her to fall. (R:197)

The plaintiff related that she is single, has no children and lives with her parents. Her daily routine is to get up, have coffee, take her medications, sometimes work on the computer for half an hour, have a few cigarettes, take a shower, read, sometimes do crafts, and go to the pool or to physical therapy. She frequently takes naps during the day because she cannot sleep at night. Dr. Zaldivar believed that the plaintiff was able to take care of her activities of daily living and appeared able to handle her finances. She also appeared able to follow directions and engage in repetitive tasks. Id.

Dr. Zaldivar noted that the plaintiff was alert, attentive, responsive and fully oriented. She was able to respond relevantly to all questions posed, maintained eye contact and could sustain a conversation. Her thinking appeared to be logical and goal-oriented, but her thought content seemed negativistic. The plaintiff expressed feelings of irritability, frustration, uselessness and depression. Her concentration, memory and judgment seemed adequate. Dr. Zaldivar concluded that the plaintiff's presentation was consistent with the diagnosis of Major Depression,

Recurrent, and he believed that continuation of psychiatric treatment was indicated. (R:197-98)

### III. <u>DECISION OF THE ALJ</u>

The ALJ first found that the plaintiff met the insured status of the Social Security Act through December 31, 2009; that the plaintiff had not engaged in substantial gainful activity since her alleged disability onset date of February 9, 2004, and that the plaintiff had severe impairments consisting of bilateral knee pain, back pain and carpal tunnel syndrome. (R:17)

Next, the ALJ summarized the evidence of the plaintiff's mental impairment. (R:17-18) The ALJ noted that although Ms. Seigel opined that the plaintiff could not return to her previous work, she did not indicate that other work would be precluded. The ALJ also stated that he had considered the opinion of Karen McNeely, as set forth in the questionnaire dated October 6, 2005, but he had it given little weight because Ms. McNeely was not an acceptable medical source as defined by 20 C.F.R. §§ 416.913(a) and (e) and 404.1513(a) and (e)(3). (R:18) Additionally, the ALJ pointed out that an opinion of disability is given very little weight, since the issue of "disability" goes beyond the issue of "the nature and severity of the claimant's impairments" and is reserved to the Commissioner pursuant to 20 C.F.R. §§ 404.1527(e) and 416.927(e). (R:19)

The ALJ referred to the reports of non-examining State Agency psychologists, prepared in August 2005 and February 2006, which concluded that the plaintiff had no more than mild limitation owing to mental disorder and that the plaintiff's mental impairment was not severe.  The ALJ determined that the record reflected no specific abnormalities of behavior, affect, thought, memory, orientation or contact with reality as a result of depression or any other mental disorder.  Further, the ALJ found there was nothing in the record showing that a mental problem interfered more than a mild degree with the plaintiff's daily activities, social functioning, concentration, persistence and pace or deterioration or decompensation in a work or work-like setting.  Id.

Based on these findings, the ALJ concluded that the plaintiff's mental disorder was only a slight abnormality that had such a minimal effect on her that it would not be expected to interfere with her ability to work, irrespective of age, education or work experience.  Therefore, the plaintiff's mental impairment was not "severe" for purposes of the Social Security Act.  Id.

The ALJ next determined that the plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. Id. The ALJ then summarized the medical evidence pertaining to the plaintiff's physical impairments. (R:19-

23) After noting the opinion of Dr. Pollack as indicated in the form completed by him on August 6, 2006, the ALJ found that the opinion was not consistent with the other evidence of record and with the doctor's own progress notes.  (R:23)

The ALJ pointed out that in May 2004, Dr. Pollack said that the plaintiff could do light duty work.  Then, in October 2004, Dr. Pollack stated that the plaintiff had reached maximum medical improvement with a 13% permanent partial disability to the body as a whole.  In November 2004, Dr. Pollack stated that the plaintiff could not return to her prior job. Id.

The ALJ emphasized that in October and November 2004, nine months after the plaintiff's surgery, the plaintiff told Ms. Seigel that she was selling her floral work and had traveled across the state for five days for this purpose.  Moreover, in December 2005, the plaintiff told Dr. Zaldivar that she spent her time working on the computer, doing crafts, exercising in the pool, visiting with friends and taking care of her activities of daily living.  Id.

The ALJ pointed out that in October 2005, Dr. Rolnick concluded that the plaintiff had some limitation in standing, walking and lifting, but did not indicate that she had any limitation in sitting or performing sedentary work.  In December 2005, Dr. Catano noted that the plaintiff had driven herself to the

23

appointment, and had reported that she did light cleaning as well as some cooking and laundry.   Dr. Catano found no motor deficits. (R:23-4)

The ALJ also noted that as of April 2006, the plaintiff reported that she kept busy doing crafts and going to church.   The ALJ stressed that there was no indication that the plaintiff was restricted from any activities or that further treatment or hospitalizations had been recommended.   Based on all of these facts, the ALJ found that Dr. Pollack's August 6, 2006, opinion on the plaintiff's physical limitations was not consistent with the record as a whole and was not entitled to controlling weight. (R:24)

The ALJ summarized the plaintiff's testimony at the hearing.   He observed that the plaintiff mentioned that she had tried physical therapy, but did not discuss any other treatments or medications she was taking.   In assessing the plaintiff's credibility, the ALJ reiterated that the plaintiff had participated in floral arranging classes and work, creative writing and extensive car trips.   Additionally, he noted that the plaintiff was working at a friend's store in February and March of 2005 and also was planning a trip to New York at that time.   The plaintiff also talked about trips to Tampa and Disney World.   (R:24-5)

24

The ALJ again referred to Dr. Pollack's statements that the plaintiff could do light duty work and that she had a 13% permanent partial disability to the body as a whole.  The ALJ also made mention of the plaintiff's statements to Dr. Zaldivar that her daily routine included working on the computer, doing crafts, exercising in the pool visiting with friends and taking care of her activities of daily living.  (R:25)

The ALJ emphasized that the MRIs of the plaintiff's knees in February 2005 showed no more than mild changes.  In June 2005, Dr. Horvath indicated that there were no deficits in grip strength or fine dexterity.  Tests performed on the plaintiff's left hand revealed a minuscule touch of carpal tunnel syndrome.  The MRI of the plaintiff's lumbar spine, also in June 2005, showed some disc protrusion and bulging, but no inpatient treatment or surgery was recommended.  Dr. Roinick recommended an aggressive weight loss program, physical therapy and strengthening, but did not suggest that the plaintiff had any limitations in sitting or performing sedentary work.  When the plaintiff visited Dr. Catano in December 2005, she drove herself to the appointment and reported that she did light cleaning as well as some cooking and laundry.  Dr. Catano found no motor deficits.  Finally, there was no evidence in the record that the plaintiff was taking any prescription pain medication. Id.

After considering all of these factors, the ALJ found that the plaintiff's statements concerning her impairments and the extent of their impact on her ability to do any work activities at all were not entirely credible, in light of the discrepancies between the plaintiff's assertions and the information contained in the documentary reports, the reports in the record, the findings made on examination and the totality of the evidence in the case. Moreover, her complaints were not supported by clinical or laboratory findings which reasonably could be expected to cause such limitations.  Finally, the plaintiff's statements were inconsistent with other evidence, and the overall evidence did not persuasively establish excess pain or greater limitations.  Id.

The ALJ stated that he generally agreed with the State Agency examining physicians who, in August 2005 and January 2006, completed physical functional capacity assessments and found that the plaintiff was not precluded from performing a significant range of sedentary and light work activities.  The ALJ found that these opinions were consistent with the medical evidence of record. (R:25-6)

For purposes of the plaintiff's disability claim, the ALJ found that the plaintiff was capable of performing a full range of sedentary work.  She could sit for approximately six hours in an eight hour day, lift up to ten pounds and occasionally lift and/or

carry articles such as docket files, ledgers and small tools.  She could walk and/or stand for approximately two hours in an eight hour day.  However, the plaintiff was unable to perform any of her past relevant work. (R:19-20, 26)

In determining whether there was work that the plaintiff could perform, the ALJ utilized the Medical-Vocational Guidelines, or "grids."  He noted that the plaintiff was 43 years old at the time of the hearing, defined as a younger individual.  She had a high school education and was able to communicate in English.  Based on the plaintiff's age, education, work experience and residual functional capacity, there were jobs which existed in significant numbers in the national economy that the plaintiff could perform.  The grids directed a finding of "not disabled," and the ALJ concluded that the plaintiff was not under a disability, as defined in the Social Security Act, from February 9, 2004 through the date of his decision.

## IV.   MOTIONS FOR SUMMARY JUDGMENT

The plaintiff seeks reversal or remand on three grounds. First, she contends that the ALJ's residual functional capacity assessment was not supported by substantial evidence. Specifically, the plaintiff argues that although the ALJ assessed the plaintiff's carpal tunnel syndrome as a severe impairment, he failed to assess the limitations resulting from this condition.

27

Additionally, the ALJ did not even consider the plaintiff's related cubital tunnel syndrome.

The plaintiff also asserts that the ALJ erred in finding that her mental impairment was not severe, disregarding the opinion of every treating and examining source on this issue. Lastly, the plaintiff contends that the ALJ erred in relying on the Medical-Vocational Guidelines, and instead should have elicited testimony from a vocational expert.

The Commissioner's seeks affirmance of the ALJ's decision on the ground that it is supported by substantial evidence and the correct legal standards were applied.

### V. RECOMMENDATIONS OF LAW

At issue before the Court is whether the final decision of the Commissioner, as reflected by the record, is supported by substantial evidence. "Even if the evidence preponderates against the Secretary, we must affirm if the decision is supported by substantial evidence." Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1985). Substantial evidence is defined as such relevant evidence as a reasonable mind would accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389 (1971); Bloodsworth v. Heckler, 703 F.2d 1233 (11th Cir. 1983). The Court must review the record as a whole to determine if the decision is supported by substantial evidence. Bloodsworth, 703 F.2d at 1239.

The Court must also determine whether the Administrative Law Judge applied the proper legal standards.  No presumption of validity attaches to the Commissioner's determination of the proper legal standards to be applied.  Richardson, supra.

A. Residual Functional Capacity

The plaintiff first contends that the ALJ erred by failing to take into account her carpal tunnel syndrome and cubital tunnel syndrome in determining her residual functional capacity. The plaintiff argues that because the ALJ determined that the plaintiff had severe impairments, one of which was carpal tunnel syndrome, he should have considered the limitations imposed by this impairment in assessing the plaintiff's residual functional capacity.  Additionally, the plaintiff argues that the ALJ erred by not considering the limitations imposed by the recently diagnosed cubital tunnel syndrome.

The medical record reflects that the plaintiff was treated for carpal tunnel syndrome in her right hand prior to her automobile accident.  Subsequently, in June 2003, neurologist Allen J. Teman, M.D., found that the plaintiff had a very minuscule touch of left hand carpal tunnel syndrome, which could be treated with nocturnal wrist splinting.

In October 2005, during a consultative examination by orthopedic surgeon, Audie M. Roinick, M.D., the plaintiff's right

hand showed a healed carpal tunnel incision with no atrophy and negative Tinel's sign.  As to her left hand, there was no tenderness at the fifth metacarpal with full range of motion.  Grip strength was good, there was no atrophy and negative Tinel's sign. He found evidence of intermittent carpal tunnel syndrome in the left upper extremity, with no neurologic changes in the right upper extremity.

In December 2005, another consultative examination was performed by John J. Catano, M.D.  Dr. Catano's examination of the plaintiff's hands revealed that her gross and fine manipulation was intact.  The plaintiff was able to button and unbutton her clothing and pick up coins.  Grip strength was 5/5 on both hands, and there was no atrophy.  Tinel's sign was negative.  Dr. Catano diagnosed status post carpal tunnel release of the right hand.

It was not until July 6, 2006, that the plaintiff returned to Dr. Pollack with complaints of pain in her left hand, that examination of the plaintiff's left arm revealed a positive Tinel's in the cubital tunnel with the reproduction of paresthesias in the ulnar nerve distribution.  There was a mildly positive Palen's examination in the wrist with an equivocal Tinel's exam, again with the reproduction of paresthesias in the ulnar nerve distribution.  Dr. Pollack recommended evaluation by a hand surgeon for further treatment of the plaintiff's cubital tunnel syndrome

and Runyon's canal syndrome, use of an elbow pad, intermittent therapy and use of medications.

The plaintiff testified that she experiences pain in her left hand, which Dr. Pollack told her was the result of cubical tunnel syndrome. As a result, it is difficult for the plaintiff to lift things. She estimated that she could lift ten pounds with her right hand, but only seven pounds with her left. She can only hold an object, such as a book or a telephone, for fifteen or twenty minutes. The plaintiff made no mention of elbow pain, and the record does not indicate whether the plaintiff followed through with Dr. Pollack's recommendation that she use an elbow pad for treatment of cubital tunnel syndrome.

Based on these facts, the undersigned finds that there is substantial evidence in the record to support the ALJ's finding that the plaintiff retained the residual functional capacity to perform sedentary work. The ALJ specifically determined that the plaintiff could sit for approximately six hours in an eight hour day, lift up to ten pounds and occasionally lift and/or carry articles such as docket files, ledgers and small tools. She could walk and/or stand for approximately two hours in an eight hour day. This finding is completely consistent with the medical record.

Despite the fact that during the sequential evaluation the ALJ gave the plaintiff the benefit of the doubt in finding that

she had the "severe" impairment of carpal tunnel syndrome, it is clear from the medical record that this impairment did not preclude the plaintiff from performing sedentary work. *See*, <u>Walters v. Barnhart</u>, 184 F. Supp. 2d 1178, 1184 (M.D. Ala. 2001).   Following her knee surgery, the plaintiff engaged in making and selling floral arrangements, as well as taking courses in creative writing. Her carpal tunnel syndrome did not recur on the right hand, and was minimal on the left.   The cubital tunnel syndrome did not appear until July 2006, and the plaintiff did not complain of elbow pain during her testimony.   There is no evidence that she followed through with Dr. Pollack's that she utilize an elbow pad to treat this problem.  Accordingly, the ALJ's residual functional capacity finding is supported by substantial evidence and should not be disturbed.

B. <u>Mental Impairment</u>

The plaintiff next contends that the ALJ erred in finding that her mental impairment was not "severe" for Social Security purposes.  The plaintiff argues that in making this determination, the ALJ ignored the opinion of every treating source.

The record reflects that the plaintiff history of depression which long predated her alleged disability onset date of February 2004, and she was taking Wellbutrin as of March 2003.  As the plaintiff herself told Options Plus, she had never lost a job

as a result of her mental problems.  Additionally, the plaintiff told the consultative psychologist, Dr. Zaldivar, that she could not work anymore because she had been in a car accident and her right knee was not getting better.  She did not suggest that her depression prevented her from working.

Judith Seigel, LCSW, who provided therapy to the plaintiff on a weekly basis, stated that the plaintiff could not return to her prior work, but did not indicate that the plaintiff was precluded from other employment.  However, Karen McNeely, the nurse practitioner with whom the plaintiff conferred for management of the medications prescribed by Dr. Pelta, opined that the plaintiff had moderate restrictions in the activities of daily living, in maintaining social functioning and in concentration, persistence or pace.  Ms. McNeely also indicated that the plaintiff experienced marked episodes of deterioration or decompensation in work or work-like settings.  The ALJ declined to give controlling weight to this opinion because a nurse practitioner is not an acceptable medical source, as defined by the Social Security regulations and because conclusions as to whether an individual is disabled are reserved to the ALJ.

In December 2005, consultative psychologist Luis R. Zaldivar noted that the plaintiff was alert, attentive, responsive and fully oriented.  She was able to respond relevantly to all

33

questions posed, maintained eye contact and could sustain a conversation. Her thinking appeared to be logical and goal-oriented, but her thought content seemed negativistic. Although the plaintiff expressed feelings of irritability, frustration, uselessness and depression, her concentration, memory and judgment seemed adequate. According to Dr. Zaldivar, the plaintiff was able to take care of her activities of daily living and appeared able to handle her finances. She also seemed able to follow directions and engage in repetitive tasks.

As the ALJ pointed out, the plaintiff kept busy by making and selling floral arrangements, traveling, exercising in the pool, visiting friends and taking writing courses. She was able to work in a friend's store until her lawyers instructed her not to do so. There is more than sufficient evidence in the record to sustain the ALJ's finding that the plaintiff's mental impairment was not severe, and did not rise to the level of a non-exertional impairment which affected her residual functional capacity. Accordingly, the plaintiff's argument on this point is not persuasive.

C. Use of the Grids

The plaintiff's final contention is that the ALJ erred in using the Medical-Vocational Guidelines or Grids in finding that there are a sufficient number of jobs in the economy that the

plaintiff can perform. Where a claimant has a non-exertional impairment that significantly limits his basic work skills, or the claimant cannot perform a full range of employment at the appropriate level of exertion, the ALJ may use the Medical Vocational Guidelines (Grids) as a framework to evaluate vocational factors, but also must introduce independent evidence, preferably through a vocational expert's testimony, of the existence of jobs in the national economy that the plaintiff can perform. Wolfe v. Chater, 86 F.3d 1072, 1077 (11th Cir. 1996); Welch v. Bowen, 854 F.2d 436, 439-40 (11th Cir. 1988).

The plaintiff here argues that she could not perform the full range of sedentary work because of the limitations imposed by her mental impairment and by carpal and cubital tunnel syndromes. As discussed above, there was substantial evidence in the record to support the ALJ's finding that the plaintiff's mental impairment was not severe and that the symptoms of her carpal and cubital tunnel syndromes were not sufficiently severe to merit consideration in the assessment of the plaintiff's residual functional capacity. Therefore, the existence of these impairments did not require the ALJ to elicit testimony from a vocational expert regarding jobs that the plaintiff could perform.

Since the decision of the ALJ is supported by substantial evidence in the record and the correct legal standards were

applied, his conclusion that the plaintiff is not entitled to Social Security Disability benefits should not be disturbed.

## VI. CONCLUSION

This Court having considered carefully the pleadings, arguments of counsel, and the applicable case law, it is hereby

RECOMMENDED that the plaintiff's Motion for Summary Judgment (Docket Entry 15) be DENIED and the Commissioner's Motion for Summary Judgment (Docket Entry 20) be GRANTED.

The parties will have ten days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, for consideration by The Honorable William J. Zloch, United States District Judge. Failure to file objections timely shall bar the parties from attacking on appeal factual findings contained herein. LoConte v. Dugger, 847 F.2d 745 (11th Cir. 1988), cert. denied, 488 U.S. 958 (1988); RTC v. Hallmark Builders, Inc., 996 F.2d 1144, 1149 (11th Cir. 1993).

DONE AND SUBMITTED at Fort Lauderdale, Florida, this 16th day of January, 2009.

Lurana S. Snow
LURANA S. SNOW
UNITED STATES MAGISTRATE JUDGE

Copies to:

Norma Staum, Esq. (P)
AUSA Stefanie Camille Moon (D)

36